COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:  Judges Decker, Malveaux and Senior Judge Annunziata

JACQUES ADAM BEIM

MEMORANDUM OPINION*
v.       Record No. 0506-18-3                          PER CURIAM
                                                       SEPTEMBER 25, 2018
ROANOKE COUNTY DEPARTMENT
 OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF ROANOKE COUNTY
Charles N. Dorsey, Judge

(A. Kristin Shandor, on briefs), for appellant.  Appellant submitting
on briefs.

(Rachel W. Lower, Assistant County Attorney; Marta J. Anderson,
Guardian *ad litem* for the minor children, on brief), for appellee.
Appellee and Guardian *ad litem* submitting on brief.


Jacques Adam Beim (father) appeals the order terminating his parental rights to his children.

Father argues that the circuit court erred in terminating his parental rights because the Roanoke

County Department of Social Services (the Department) failed to prove that (1) he did not

"substantially remedy the conditions which led to or required the children's foster care pursuant to"

Code § 16.1-283(C)(2) and (2) "termination and adoption [were] in the best interests of the

children."  Father also asserts that the "initial Petition for Protection Order was fatally flawed in that

it was not a verified petition signed by the affiant as required by" Code § 16.1-262.  Upon reviewing

the record and briefs of the parties, we conclude that the circuit court did not err.  Accordingly, we

affirm the decision of the circuit court.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

BACKGROUND

"On appeal, 'we view the evidence and all reasonable inferences in the light most favorable to the prevailing party below, in this case the Department.'" Farrell v. Warren Cty. Dep't of Soc. Servs., 59 Va. App. 375, 386, 719 S.E.2d 329, 334 (2012) (quoting Jenkins v. Winchester Dep't of Soc. Servs., 12 Va. App. 1178, 1180, 409 S.E.2d 16, 18 (1991)).

In September 2014, father and Robyn Sanette Musolff (mother) were living in a hotel room with K.B. and J.B., who were two years old and four years old at the time, and mother's child, L.M., who was nine years old.[1]  The Department received a complaint regarding the children's lack of supervision and lack of hygiene.  On September 26, 2014, Robin Freeman, a child protective services worker with the Department, made an unannounced visit to the hotel room.  When Freeman arrived, she encountered J.B. and L.M. in the parking lot, unsupervised.  J.B. wore only a "sagging" diaper and did not speak.  Freeman asked L.M. to get her mother, who was in another hotel room. When mother met Freeman, she had K.B. with her, and like J.B., K.B. did not have on any clothes, except for a "sagging" diaper.  Freeman observed mother and father's hotel room, which was "very cluttered," "unorganized," and had a "strong smell of body odor."  Father was at work when Freeman visited on September 26, 2014, and she did not speak with him.

After forty-five days, the Department filed petitions for child protective orders.  At the July 10, 2017 hearing, mother asked Freeman about those petitions.  Freeman admitted that a "CPS worker on [her] team" signed the petitions and affidavit for her.  Freeman explained that she wrote the affidavit but did not sign it or appear before the intake officer because she "had a procedure that day and wasn't able to."  Freeman had reviewed the case with the other CPS worker prior to the filing of the petitions and affidavit.  Freeman confirmed that the other CPS worker's information about the case would have been "secondhand."

---

[1] Father is the biological father to J.B. and K.B., but not L.M.

On November 24, 2014, the Roanoke County Juvenile and Domestic Relations District Court (the JDR court) entered an *ex parte* preliminary child protective order. On December 2, 2014, the JDR court conducted a hearing with all parties present and entered preliminary protective orders for the children. On December 3, 2014, Angie Wooten, a family services specialist with the Department, made a home visit. She offered numerous service referrals, but mother was not receptive. On December 19, 2014, the JDR court conducted another hearing, with all parties present, and entered the preliminary child protective orders.

On January 22, 2015, the Department received a call regarding the welfare of the children and possible eviction of the family from their hotel room. At approximately 5:30 p.m., Wooten went to the parties' hotel room and spoke with mother.[2] Wooten found that the room was "cluttered, dirty dishes, dried food covered in the sink . . . . Dirty clothes were piled in the bathroom almost to the ceiling." The room also had a "strong odor." The Department determined that "the hotel room was not suitable . . . to leave the kids there for the night." Mother was argumentative and refused to answer many of the Department's questions. The police were called to the scene and instructed mother to cooperate with the Department. Mother eventually contacted the children's maternal grandmother, and mother, Wooten, and the maternal grandmother developed a verbal safety plan. The maternal grandmother agreed to take the children to her house for the night, while the parents cleaned the room. At approximately 10:00 p.m., Wooten was called back to the hotel room because the maternal grandmother still had not taken the children to her home. Wooten then took the children into the Department's custody. The Department filed petitions for emergency removal of the children.

When the children entered foster care, all of them had head lice. J.B. and K.B. had "poor personal boundary issues," and K.B. was educationally delayed. Initially, J.B., K.B., and L.M. were

_____

[2] Father was at work.

placed in the same foster home, but L.M. was removed in March 2015 due to inappropriate sexual behaviors.

On January 27, 2015, the JDR court entered preliminary removal orders and adjudicated that the children were abused or neglected. On February 27, 2015, the Department conducted a family partnership meeting in order to assess the family's needs and required the parents to participate in a parental capacity evaluation.[3] On March 17, 2015, the JDR court entered a dispositional order finding that the children were abused and neglected and approved the initial foster care plans with the concurrent goals of return home and relative placement.[4]

While the children were in foster care, the Department offered weekly visitation to the parents. However, the Department suspended mother's visitation on April 20, 2015, based on the counselor's recommendations and mother's inappropriate behavior during visitations. On the other hand, father regularly visited with the children, and eventually visited with them in the community and in a supervised visitation setting. After consultation with the children's therapists, foster parents, and the guardian *ad litem*, the Department ended father's visitation with J.B. on August 15, 2016, with L.M. on November 7, 2016, and with K.B. on November 14, 2016.

After an extensive investigation of possible relative placements, the Department ultimately concluded that there were no viable relative placements. The Department provided ongoing counseling for the children. After father completed the parenting capacity evaluation, the Department recommended individual counseling for father, which he participated in and was

---

[3] The Department continued to discuss with mother and father the need for the parental capacity evaluation throughout March, April, May, and June 2015.

[4] Father appealed the matter to the circuit court. On June 3, 2015, the parties appeared before the circuit court. After hearing the evidence and argument, the circuit court found that the children were abused and neglected and approved the initial foster care plans. Father appealed to this Court, which affirmed the circuit court's rulings. See Beim v. Roanoke Cty. Dep't of Soc. Servs., No. 1210-15-3, 2016 Va. App. LEXIS 44 (Va. Ct. App. Feb. 16, 2016).

released in June 2016. Father completed a parenting class that the Department recommended. In August 2016, father reported that he was living in a three-bedroom house.

On March 1, 2016, CPS received a complaint against mother regarding L.M. and J.B. On April 22, 2016, there was a Level 1 finding of sexual abuse against mother. As a result of the Level 1 finding, the Department met with father on August 30, 2016, and asked him whether he would be willing to separate from mother and parent the children without her. Father told the Department that "he did not believe the allegations and that he would not be separating from [mother]." He explained that mother was appealing the finding and that he wanted to wait to see what happened with her appeal. The Department indicated that it was not willing to wait, especially since the children had been in foster care since January 22, 2015, and stopped offering services to father.

Since father was not willing to separate from mother and the children had been in foster care for more than twelve months, in September 2016, the Department filed foster care plans with the goal of adoption and petitions for termination of parental rights. On October 25, 2016, the JDR court terminated father and mother's parental rights and approved the foster care plans with the goal of adoption. Both parents appealed to the circuit court.

On July 10 and 11, 2017, the parties appeared before the circuit court. The Department presented evidence about the children's well-being. Initially, the children were placed in the same foster home but, later, were separated into different homes. Then, on May 15, 2017, K.B. moved into J.B.'s foster home. K.B. and J.B. had "some struggles" and anxiety about living together again, so they were in counseling to help them adjust. The foster parents told the Department that they would like to adopt the children.

At the conclusion of the Department's evidence, both parents made motions to strike, which the circuit court took under advisement. Then, after a recess, the parties announced that they had reached an agreement. Mother agreed to participate in individual counseling, meet with the

children's counselors, sign all releases, participate in a psychiatric evaluation and comply with its recommendations, maintain stable housing, and complete a parenting class. Mother and father agreed to certain restrictions regarding social media. Furthermore, they agreed to cooperate and comply with the Department's requests and stay in contact with the Department. Father agreed to participate in individual counseling, meet with the children's counselors, sign all releases, maintain stable employment, maintain stable housing, and complete a parenting class. On July 21, 2017, the circuit court entered an order reflecting the parties' agreement and continuing the case to review the parents' compliance with the order or "a recommencement of the trial *de novo* of the Appeals."

On November 28, 2017, the parties appeared before the circuit court. Neither parent complied with all of the terms of the agreed order. The Department explained that after the July 11 hearing, the parents informed the Department that they had moved to New York City in November 2016. Father made an appointment with a counselor in Virginia, but did not show up for the appointment or cancel it. He did not provide the Department with a letter from his employer, and the Department did not know about father's housing situation. He did not complete the parenting class, but he did sign the requested releases. The Department presented evidence that K.B. and J.B. were stable and living together in the same foster home. Both children were "struggling behaviorally" but participating in outpatient counseling.

After the Department presented its evidence at the November 28, 2017 hearing, mother and father renewed their motions to strike, which the circuit court overruled. Father testified that after his father passed away, he and mother moved to New York City to live in his father's apartment. Father explained that he was unable to travel to Virginia and see his former counselor, so he tried to seek counseling services in New York City but had not seen anybody as of the hearing. Father admitted that he had not participated in a parenting class since the July 11, 2017 hearing.

At the conclusion of all of the evidence, father renewed his motion to strike, which the circuit court denied. After hearing the parties' arguments, the circuit court terminated father's parental rights pursuant to Code § 16.1-283(C)(2) and held that the termination of father's parental rights was in the best interests of the children.[5] In addition, the circuit court approved the foster care goal of adoption. On March 5, 2018, the circuit court entered an order memorializing its rulings. This appeal followed.

ANALYSIS

"On review, '[a] trial court is presumed to have thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests.'" Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 558, 811 S.E.2d 835, 840-41 (2018) (quoting Logan v. Fairfax Cty. Dep't of Human Dev., 13 Va. App. 123, 128, 409 S.E.2d 460, 463 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." Fauquier Cty. Dep't of Soc. Servs. v. Ridgeway, 59 Va. App. 185, 190, 717 S.E.2d 811, 814 (2011) (quoting Martin v. Pittsylvania Cty. Dep't of Soc. Servs., 3 Va. App. 15, 20, 348 S.E.2d 13, 16 (1986)).

*Substantially remedy the conditions*

Father argues that the circuit court erred in finding that father did not substantially remedy the conditions which led to, or required, the children's foster care placement. Father contends that he met the Department's requirements by participating in individual counseling, completing a parenting class, maintaining employment, and attending visitation.

---

[5] The circuit court also terminated mother's parental rights to the children. She appealed that ruling to this Court. See Musolff v. Roanoke Cty. Dep't of Soc. Servs., Record No. 0521-18-3.

The circuit court terminated father's parental rights pursuant to Code § 16.1-283(C)(2), which states that a court may terminate parental rights if:

> The parent or parents, without good cause, have been unwilling or unable within a reasonable period of time not to exceed 12 months from the date the child was placed in foster care to remedy substantially the conditions which led to or required continuation of the child's foster care placement, notwithstanding the reasonable and appropriate efforts of social, medical, mental health or other rehabilitative agencies to such end.

"[S]ubsection C termination decisions hinge not so much on the magnitude of the problem that created the original danger to the child, but on the demonstrated failure of the parent to make reasonable changes." Toms v. Hanover Dep't of Soc. Servs., 46 Va. App. 257, 271, 616 S.E.2d 765, 772 (2005). "Considerably more 'retrospective in nature,' subsection C requires the court to determine whether the parent has been unwilling or unable to remedy the problems during the period in which he has been offered rehabilitation services." Id. (quoting City of Newport News Dep't of Soc. Servs. v. Winslow, 40 Va. App. 556, 562-63, 580 S.E.2d 463, 466 (2003)).

On appeal, father focuses on the August 17, 2016 permanency planning orders, which had concurrent goals of return home and adoption. Those orders stated that the circuit court made the following finding:

> Since return home remains that plan for the child: (i) the parent has made marked progress toward reunification with the child; (ii) the parent has maintained a close and positive relationship with the child; (iii) the child is likely to return home in the near future, although it is premature to set the exact date at the time of this hearing.

However, the corresponding foster care plans indicated that the Department was waiting for the results from the attachment assessment, and until the results were received, "a determination regarding placement [was] unable to be made."

Dr. William F. Whelan conducted the attachment assessments with father and each child. Dr. Whelan first observed K.B. and father. As soon as K.B. saw father, Dr. Whelan reported that K.B. "began screaming, clutching onto the other adult, saying 'No' and then asking for his brother." Dr. Whelan determined that K.B.'s initial reaction was "highly associated with poor outcomes in child development." Dr. Whelan also noticed that K.B. had a pattern of "anxious inhibition" around father and "tended to keep his needs to himself." When father and J.B. interacted, Dr. Whelan found that J.B.'s "primary attachment pattern is also insecure, anxious avoidance." Dr. Whelan opined that father's "behavior was kind, but also emotionally inhibited. His caregiving patterns are narrowly developed at this point, and together, the combination of these things is a high risk for kids who have had significant losses or maltreatment." In his report, Dr. Whelan concluded that father is "generally unable to perceive and respond to the children's emotional and attachment needs in a sensitive manner" and, further, that the results of the evaluation "reflect high levels of risk to the children in terms of developmental outcomes."

After receiving the results of the attachment assessments, the Department recommended that the foster care plan's goal be changed to adoption. The Department also filed petitions for termination of father's parental rights to K.B. and J.B. At the hearing on October 25, 2016, the JDR court terminated father's parental rights to K.B. and J.B. and approved the goals of adoption.

Father had more time to remedy the conditions that led to the children's continued placement in foster care after he appealed the matters to the circuit court. Following a two-day hearing in July 2017, the circuit court gave father an additional chance to remedy those conditions in accordance with the agreed order that father would participate in individual counseling, meet with the children's counselors as recommended, refrain from posting anything on social medial about the children, contact the Department by e-mail on the first and third

Mondays of each month, maintain stable employment, maintain stable housing, sign releases, respond to the Department's requests within twenty-four hours, complete a parenting class, and cooperate with any additional services recommended by the Department at a later date. However, by November 28, 2017, father still had not complied with the Department's requirements. He had moved to New York City without notifying the Department until after the July 11, 2017 hearing. As a result of his move, he did not participate in counseling and a parenting class. The Department was unable to verify father's employment and housing status. During the November 28, 2017 hearing, the circuit court told father, "From what I've heard so far, you failed and failed miserably in terms of trying to take advantage of opportunities that are being afforded to you that could have [been] comparably easy, not that there's no work involved." The circuit court found that father was "given an opportunity to fix the problem and instead [he] remove[d] [him]self up the coast several states." The circuit court held that father had "been given more opportunity and more access to services and more effort to try and restore a parental relationship than any case I have ever [had]."

Despite given numerous opportunities, father did not comply with the Department's requirements and did not remedy the conditions that led to the children's continued placement in foster care. Based on the record, the circuit court did not err in terminating father's parental rights pursuant to Code § 16.1-283(C)(2).

<em>Best interests of the children</em>

Father argues that the circuit court erred in finding that the termination of his parental rights and adoption were in the best interests of the children. "When addressing matters concerning a child, including the termination of a parent's residual parental rights, the paramount consideration of a trial court is the child's best interests." Tackett v. Arlington Cty. Dep't of

- 10 -

Human Servs., 62 Va. App. 296, 319, 746 S.E.2d 509, 521 (2013) (quoting Logan, 13 Va. App. at 128, 409 S.E.2d at 463).

The evidence proved that the children had been in foster care since January 22, 2015. At the November 28, 2017 hearing, the social worker testified that J.B. had been in the same foster home since July 2015, and K.B. had moved into J.B.'s foster home in May 2017. Their placements were "stable." Both J.B. and K.B. were "struggling behaviorally," but they were attending counseling.

As discussed above, father was unable or unwilling to remedy the situation that led to the children being placed in, and remaining in, foster care. By the time of the final hearing, the children had been in foster care for almost three years. "It is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." Id. at 322, 746 S.E.2d at 522 (quoting Kaywood v. Halifax Cty. Dep't of Soc. Servs., 10 Va. App. 535, 540, 394 S.E.2d 492, 495 (1990)). Accordingly, the circuit court did not err in finding that it was in the children's best interests to terminate father's parental rights and approve the goal of adoption.

*Initial petition for protective order*

Father argues that the initial petition for the protective order was "fatally flawed" because it did not comply with Code § 16.1-262. He asserts that the petition for the protective order and the affidavit were not signed by the affiant. Although Freeman testified that she prepared the petition and affidavit, she did not sign them or appear before the intake officer. Father contends that this flaw renders the pleading invalid and that the entire matter should be dismissed because the circuit court did not have proper jurisdiction.

Code § 16.1-260(A), governing the commencement of matters before juvenile and domestic relations district courts, directs that matters "alleged to be within the jurisdiction" of

the juvenile and domestic relations district courts "shall be commenced by the filing of a petition" in accordance with Code § 16.1-262. Code § 16.1-262(C) requires the petition to be verified, and Code § 16.1-253 governs preliminary protective orders. A motion or petition for a preliminary protective order "shall be supported by an affidavit or by sworn testimony in person before the judge or intake officer." Code § 16.1-253(B). However, "[f]ailure to comply with the procedures set forth in [Code § 16.1-260] shall not divest the juvenile court of . . . jurisdiction." Code § 16.1-260(I).

The JDR court entered *ex parte* preliminary child protective orders on November 24, 2014. Then, on December 2, 2014, a hearing was held with all parties present, and the JDR court again issued preliminary child protective orders. Another hearing was held on December 19, 2014, with all parties present, and the JDR court again entered preliminary child protective orders.

Prior to the next scheduled court date, the Department filed separate petitions for the children's removal, and the matters were assigned different case numbers than the preliminary child protective orders. On January 27, 2015, the JDR court entered the preliminary removal orders. As the case progressed, the Department filed additional petitions, including the petitions to terminate father's parental rights.

During the July 11, 2017 hearing, mother's counsel conceded that there was a separate petition for the emergency removal and told the circuit court, "So I guess the Court has to decide even if the Protective Order was a nullity, does that even matter because there was another Removal Petition filed, a separate correct document."[6] The circuit court held that any possible flaw in the petition for the child protective order did not impact the court's jurisdiction because all parties had notice of, and participated in, the remaining proceedings.

---

[6] Father's counsel adopted mother's argument.

- 12 -

Code § 16.1-283(A) states, "No petition seeking termination of residual parental rights shall be accepted by the court prior to the filing of a foster care plan, pursuant to § 16.1-281, which documents termination of residual parental rights as being in the best interests of the child." The Department filed the requisite foster care plans and the petitions for termination of parental rights. Furthermore, father had notice of, and participated in, the foster care proceedings, including the hearings regarding the termination of his parental rights.

Contrary to father's arguments, the circuit court had jurisdiction to terminate father's parental rights and approve the goal of adoption pursuant to the separate petitions filed by the Department. See Code § 16.1-260(I) ("Failure to comply with the procedures set forth in the section shall not divest the juvenile court of . . . jurisdiction."); Rudolph v. City of Newport News Dep't of Human Servs., 67 Va. App. 140, 149, 793 S.E.2d 831, 836 (2016) (rejecting the contention that the "lower courts did not acquire active jurisdiction" even though a non-lawyer signed the petitions for emergency removal). Accordingly, the circuit court had jurisdiction over the termination of parental rights and permanency foster care plans.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

Affirmed.